176 F.3d 301
 UNITED STATES of America, Plaintiff-Appellee,
v.
Maurice WILLIAMS (96-3546), Marshon Mays (96-3558), Reginald
Crenshaw (96-3704), Sherman Giles (96-3928), Paul
Crump (96-3998), and Wesley Moore
(96-4021), Defendants-Appellants.
 Nos. 96-3546, 96-3558, 96-3704, 96-3928, 96-3998 and 96-4021.
 United States Court of Appeals,
Sixth Circuit.
 Argued (96-3546/96-3704/96-3928/96-3998) and Submitted
(96-3558/96-4021) Jan. 27, 1999.
Decided Feb. 23, 1999.*
Ordered Published March 24, 1999.
 
 Terry Lehmann (argued and briefed), Office of the U.S. Attorney, Cincinnati, Ohio, for Plaintiff-Appellee.
 Michael T. Gunner (argued and briefed), Gunner & Banchefsky, Hilliard, Ohio, for Maurice Williams.
 William J. Rapp (briefed), Cincinnati, Ohio, for Marshon Mays.
 Lawrence J. Greger (argued and briefed), Dayton, Ohio, for Reginald Crenshaw.
 Thomas G. Eagle (argued and briefed), Thomas G. Eagle Company L.P.A., Franklin, Ohio, for Sherman Giles.
 Robert F. Barnes, Jr. (argued and briefed), Cincinnati, Ohio, for Paul Crump.
 Ronald E. Schwartz (briefed), Cincinnati, Ohio, for Wesley Moore.
 Before: MERRITT and MOORE, Circuit Judges; DUGGAN,** District Judge.OPINION
 MOORE, Circuit Judge.
 
 
 1
 On March 23, 1995, a federal grand jury in Columbus, Ohio, returned a 185-count indictment against forty-one defendants. The six defendants-appellants named here all pleaded guilty to Count One of the indictment--conspiracy "to possess with the intent to distribute and to distribute cocaine and more than five grams of cocaine base, commonly referred to as crack"--and several of the defendants pleaded guilty to at least one additional count, detailed below. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). Each defendant makes several claims of error regarding his plea and/or his sentencing. For the following reasons, however, we AFFIRM the district court.
 
 
 2
 * The government alleges that the conspiracy began in 1989, when defendant Mays and other residents of the "Short North" area of Columbus, Ohio, began selling crack cocaine. Following a shooting of one of the group, Mays decided the original group needed to organize for its own protection, and dubbed the new group the "Short North Posse." By 1993, local police had begun to investigate the group and undercover detectives had started to make buys of crack cocaine in the Short North area. There are instances of purchases from some of the defendants to this case in April, May, June, July, and September 1993. There were two more undercover buys in April 1994.
 
 
 3
 By May 1994, federal agents became involved in the investigation. The federal agents posed as West Side dealers and allegedly made purchases from the defendants named above in May, July, September, October, and November 1994. Two search warrants were executed in 1994, one in April and one in November, but neither deterred continued drug sales. Another undercover agent made a purchase from Giles on March 8, 1995. Two weeks later a majority of the group was indicted.
 
 
 4
 The federal grand jury sitting in Columbus, Ohio, returned a 185-count indictment against forty-one defendants on March 23, 1995, the lynchpin of the indictment being a conspiracy to possess with the intent to distribute cocaine base and the distribution of cocaine base. Each of these six defendants was charged with Count One, the conspiracy count, and at least three other counts. Each defendant herein entered a plea of guilty on various dates in 1995 in the weeks leading up to the trial for the remaining defendants: Reginald Crenshaw on August 23 to the conspiracy count; Paul Crump on September 11 to the conspiracy count and two counts of money laundering; Marshon Mays on September 15 to the conspiracy count and distribution of crack; Maurice Williams on September 17 to the conspiracy count and one count of use of a firearm during a drug trafficking crime; Wesley Moore on September 26 to the conspiracy count and one count of use of a firearm during a drug trafficking crime; and Sherman Giles on September 26 to the conspiracy count and one count of use of a firearm during a drug trafficking crime.
 
 
 5
 The trial of eight alleged co-conspirators began on September 27, 1995, and lasted several weeks. In 1996, each of the defendants named here was sentenced: Maurice Williams on April 29 to 121 months on the conspiracy count (by this time the firearm count had been dropped pursuant to the Supreme Court decision in Bailey v. United States, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)); Marshon Mays on April 30 to 109 months on the conspiracy count and distribution of crack; Reginald Crenshaw on June 13 to 130 months on the conspiracy count; Sherman Giles on August 22 to 300 months on the conspiracy count (the Bailey count was dropped); Paul Crump on August 29 to 156 months on the conspiracy count and two counts of money laundering; and Wesley Moore on September 3 to 186 months on the conspiracy count (the Bailey count was dropped). Each defendant filed a timely notice of appeal.
 
 II
 
 6
 Each defendant makes two or three arguments about his individual plea agreement and/or sentence. We will address each defendant's arguments in turn.
 
 
 7
 * Defendant Maurice Williams first argues that the two-level enhancement under the guidelines for possession of a firearm pursuant to U.S. SENTENCING GUIDELINES MANUAL (U.S.S.G.) § 2D1.1(b)(1) (1995) was erroneous, based substantially on the fact that his 18 U.S.C. § 924(c) gun count was dismissed in the wake of Bailey v. United States, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). A district court's finding that the defendant possessed the firearm during the drug crime is a factual finding subject to review for clear error. United States v. Elder, 90 F.3d 1110, 1133 (6th Cir.1996), cert. denied, 519 U.S. 1131, 117 S.Ct. 993, 136 L.Ed.2d 873 (1997).
 
 
 8
 Bailey clarified the term "use" in 18 U.S.C. § 924(c)(1) in the phrase "uses or carries." The guideline enhancement, however, specifically refers only to "possession" (construed as actual or constructive possession). This court has held that acquittal under 18 U.S.C. § 924(c)(1) "does not necessarily preclude a sentencing enhancement for possession of a firearm under U.S.S.G. § 2D1.1(b)" not only because of the different terminology but also in part because the burden of proof at sentencing is preponderance of the evidence and not beyond a reasonable doubt, as at trial. United States v. McCall, 85 F.3d 1193, 1198 (6th Cir.1996); see also Elder, 90 F.3d at 1133; United States v. Duncan, 918 F.2d 647, 652 (6th Cir.1990), cert. denied, 500 U.S. 933, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991). In other words, Bailey has little to say about the appropriateness of a guidelines enhancement for possession.
 
 
 9
 Application Note 3 to U.S.S.G. § 2D1.1 states in part:
 
 
 10
 The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.
 
 
 11
 U.S.S.G. § 2D1.1 commentary, applic. note 3; see also United States v. Moreno, 899 F.2d 465, 470 (6th Cir.1990), cert. denied, 503 U.S. 948, 112 S.Ct. 1504, 117 L.Ed.2d 643 (1992); United States v. Cochran, 14 F.3d 1128, 1132 (6th Cir.1994). In order for the enhancement to apply, the government must establish that (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense. United States v. Hill, 79 F.3d 1477, 1485 (6th Cir.), cert. denied, 519 U.S. 858, 117 S.Ct. 158, 136 L.Ed.2d 102 (1996). "Constructive possession of an item is the ownership, or dominion or control over the item itself, or dominion over the premises where the item is located." Id. (internal quotations omitted). Moreover, if it is reasonably foreseeable to a defendant that his co-conspirator possesses a gun, constructive possession is attributable to him as well. However "[w]e are not willing to indulge the fiction that a firearm's presence always will be foreseeable to persons participating in illegal drug transactions.... [A]t a minimum, we require that there be objective evidence that the defendant knew the weapon was present, or at least knew it was reasonably probable that his coconspirator would be armed." Cochran, 14 F.3d at 1133.
 
 
 12
 In the present case, we cannot conclude that the district court clearly erred by enhancing Williams's sentence for possession of a firearm. First, Williams was arrested during the execution of a search warrant at a residence that was clearly the location of much of the drug activity. Near him on a shelf in the room where he was arrested was a loaded handgun, easily accessible by anyone in the residence. During the change of plea hearing, an officer described the search of the residence and who was present. He added: "Near the person of Maurice Williams a loaded handgun was recovered.... The firearm was present for the purpose of protecting the cocaine base that was seized." Joint Appendix ("J.A.") at 645 (Change of Plea Hr'g at 30). Williams accepted these statements as true when asked by the district judge, and pleaded guilty both to being a part of the conspiracy and to a "use or carry" count prior to Bailey, thereby effectively admitting the facts underlying that count. Although it is a closer case than many, it was not clear error for the district court to find that the government had met its burden of proving by a preponderance of the evidence that Williams constructively possessed a weapon during the course of this conspiracy.
 
 
 13
 Second, Williams argues that the government should have moved for a downward departure under U.S.S.G. § 5K1.1 for Williams's provision of substantial assistance to the government. Williams seems to concede that absent a condition in the plea agreement that binds the government to move for a downward departure, Williams is confined to arguing under Wade v. United States, 504 U.S. 181, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992), that the government failed to move for constitutionally impermissible reasons (such as race or religion). Since Williams has made no such showing, this argument must fail.
 
 
 14
 Williams's plea agreement uses language that is explicitly discretionary in discussing the possibility of a downward departure for substantial assistance, see J.A. at 353 (Williams's Plea Agreement at 4, p 9), and we have held that this type of language affords no basis for arguing that the government was obliged to ask for such a departure, absent a showing of unconstitutional motives such as those contemplated in Wade. See United States v. Epley, 52 F.3d 571, 579 (6th Cir.1995); United States v. Johnson, 46 F.3d 19, 20 (6th Cir.1995). The government has given reasons, both in its brief to this court and to the district court at sentencing, for its decision not to move for departure, and Williams has not disputed those reasons. Finally, Williams's acceptance of responsibility is not the same as substantial assistance (even if sometimes lack of the former is used to bolster an argument for failing to depart on the latter), and his three-level reduction for acceptance of responsibility in no way obligates the government to ask for a departure.
 
 B
 
 15
 Defendant Marshon Mays first argues that the 100:1 sentencing ratio for crack versus powder cocaine is unconstitutional, but then admits that this circuit has consistently denied the unconstitutionality of the crack-powder ratio. See, e.g., United States v. Hill, 79 F.3d 1477, 1488 (6th Cir.), cert. denied, 519 U.S. 858, 117 S.Ct. 158, 136 L.Ed.2d 102 (1996); United States v. Tinker, 985 F.2d 241, 242 (6th Cir.1992), cert. denied, 507 U.S. 1040, 113 S.Ct. 1872, 123 L.Ed.2d 491 (1993). See also United States v. Gaines, 122 F.3d 324, 329-30 (6th Cir.) (holding that district court did not have authority to depart based on Sentencing Commission's proposal to eliminate the 100:1 ratio, because Congress affirmatively rejected that proposal), cert. denied, --- U.S. ----, 118 S.Ct. 396, 139 L.Ed.2d 310 (1997). We are bound by these circuit precedents.
 
 
 16
 Mays's second argument is that the government did not prove that the substance he distributed was the crack form of cocaine base. Because Mays did not object to the drug's characterization as crack at his plea hearing or sentencing, this court reviews the issue for plain error. See United States v. Causey, 834 F.2d 1277, 1281 (6th Cir.1987) ("Plain errors are limited to those harmful ones that are so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty, or public reputation of the trial."), cert. denied, 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988). The government bears the burden of proving the substance was crack by a preponderance of the evidence. See United States v. Jones, 159 F.3d 969, 982 (6th Cir.1998).
 
 
 17
 The district court did not commit plain error. The government relies on three unpublished opinions in the circuit which involved similar facts and upheld the sentencing for crack cocaine under the guidelines, the most similar of which is United States v. West, No. 96-3595, 1997 WL 640133 (6th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1092, 140 L.Ed.2d 148 (1998). West held that the use of the term "crack" in the indictment, at the change of plea hearing, and in the uncontested facts of the presentence report, was enough to affirm the district court's decision that the government had proved the substance was crack by a preponderance of the evidence. In a recent published opinion, Jones, 159 F.3d 969, mentioned above, the defendant argued that the government needed to prove that the substance involved was processed using sodium bicarbonate. A panel of this court disagreed, citing a note to the drug quantity table in the Sentencing Guidelines that defines "crack" as "the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S.S.G. § 2D1.1(c)(n.D). Noting the term "usually," the panel concluded that the government did not have to prove the use of sodium bicarbonate, and on the facts before it, affirmed the district court's factual finding that the substance was crack.
 
 
 18
 In Mays's case, the term "crack" was used in the indictment, at the plea hearing, and in the uncontested facts of the presentence report. Mays pleaded guilty to the charge and did not contest the use of the term "crack" at any stage below. This distinguishes him from the defendants in United States v. James, 78 F.3d 851 (3d Cir.) (term "crack" only mentioned by counsel for the government, but not in the written documents and not by defendant), cert. denied, 519 U.S. 844, 117 S.Ct. 128, 136 L.Ed.2d 77 (1996), and United States v. Johnson, 976 F.Supp. 284, 291 (D.Del.1997) ("Johnson consistently and unequivocally reserved his right to contest the Government's position that the cocaine base is crack for sentencing."), on which he relies. The district court's finding that a preponderance of the evidence proved the substance to be crack was not plain error.
 
 C
 
 19
 Two of defendant Reginald Crenshaw's claims of error relate to the Rule 11 colloquy between himself and the judge on the date of his change of plea hearing. Deviations from the procedures outlined in Federal Rule of Criminal Procedure 11 are subject to harmless error analysis and "[a]ny variance from the procedures required by this rule which does not affect substantial rights shall be disregarded." FED. R.CRIM. P. 11(h).
 
 
 20
 Some of Crenshaw's accusations are technical deviations from Rule 11, but do not "affect substantial rights" and are thus harmless. These include the fact that the U.S. Attorney stated the potential sentence as a "mandatory minimum term of imprisonment, 5 years possible to a maximum of 40 years," J.A. at 451-52 (Tr. Plea Hr'g at 6-7), the fact that the district court failed to inquire into discussions between Crenshaw or his lawyer and the United States Attorney, and the fact that the district court said that it would "probably" send the defendant to prison if the guilty plea was accepted. J.A. at 453 (Tr. Plea Hr'g at 8). As to the first point, the district court restated the sentencing range afterwards, and it was written clearly in Paragraph Two of the plea agreement that Crenshaw signed. J.A. at 441. As to the second issue, the purpose of inquiring into discussions between the parties is to determine the nature of the plea agreement, a fact that is patently clear when the written document is signed. Last, the use of the word "probably" did not taint the plea agreement. The district court asked most of the usual questions during the plea colloquy, which substantially complied with the dictates of Rule 11. There is no indication that Crenshaw was confused or misled as to the nature of the proceedings, and any deviations amounted to harmless error. See, e.g., United States v. Bashara, 27 F.3d 1174, 1178-80 (6th Cir.1994) (failure to notify defendant of mandatory minimum deemed harmless error), cert. denied, 513 U.S. 1115, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); United States v. Stead, 746 F.2d 355, 356-57 (6th Cir.1984) (failure to inform defendant of his right to confront and cross-examine witnesses and to be free from self-incrimination deemed harmless error), cert. denied, 470 U.S. 1030, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985).
 
 
 21
 Crenshaw's other complaints about the plea colloquy include suggestions that may have made the exact sentencing range clearer to Crenshaw, but are not required by the dictates of Rule 11. Generally, it is for defendant's counsel to explain how the guidelines will apply to his case and what the likelihood of enhancements and departures will be. The judge asked Crenshaw if his attorney had gone over these issues with him, and Crenshaw answered that he had. Finally, Crenshaw makes references to the plea bargain as coercive or involuntary, and many of these contentions were explored at the plea hearing on Crenshaw's motion to vacate his guilty plea (which was denied orally and withdrawn by Crenshaw before the court had ruled in writing). However, the record discloses little or nothing to support the assertion that Crenshaw's plea was not "knowing and voluntary."
 
 
 22
 Crenshaw also makes two arguments about his plea agreement: first, that the government was obliged to move for a departure for substantial assistance but did not do so; and second, that the agreement should have been void when Crenshaw did not comply fully with its terms. Despite his assertions that a downward departure for substantial assistance was mandatory, Crenshaw correctly reproduces in his brief the discretionary language of the plea agreement. The plea agreement stated that the government agreed to move for a departure if Crenshaw substantially cooperated, at the government's discretion, and even then the motion would be granted at the discretion of the court. J.A. at 358 (Crenshaw Plea Agreement at 4, p 9). Although Crenshaw performed remarkably well up to and including his testimony on the first day of his alleged co-conspirators' trial, he sought to vacate his plea shortly thereafter and took the stand again before the same jury several days later, recanting his earlier testimony. Clearly, such an act provided the government with a legitimate reason to decline to move for a substantial-assistance departure, and Crenshaw has pointed to nothing that would indicate another (unconstitutional) reason for the government's failure to so move.
 
 
 23
 Crenshaw also makes a hyper-technical-contract argument that because he did not comply fully with the terms of the plea agreement (presumably, by recanting his testimony), the plea should have been held "void and of no effect." J.A. at 357 (Plea Agreement at 3, p 6). But Crenshaw's motion to vacate his plea was followed by an extensive hearing on the issue. The judge denied the motion from the bench but had not ruled formally when he received a letter from Crenshaw asking to withdraw his motion to vacate and apologizing for the inconvenience to the court. J.A. at 858 (Tr. Sentencing at 14). And at the sentencing hearing, his attorney moved to withdraw the motion to vacate his plea in accordance with the letter. The argument made in his appellate brief was not made before the district court, and the district court was certainly not obliged to void the plea agreement sua sponte. In any case, the standard of review is abuse of discretion, see United States v. Bazzi, 94 F.3d 1025, 1027 (6th Cir.1996), and no such abuse occurred here.
 
 
 24
 Finally, Crenshaw argues that he should have been granted not only two but three acceptance of responsibility points under U.S.S.G. § 3E1.1. He was granted a two-point decrease under § 3E1.1(a) for acceptance of responsibility, but denied the third under § 3E1.1(b) even though his offense level was greater than 16 and he originally provided timely and "complete information to the government concerning his own involvement in the offense." The difficulty is that he later recanted his trial testimony and moved to withdraw his plea agreement, subjecting the court to a hearing on the issue, before restating his original position and accepting responsibility.
 
 
 25
 In United States v. Corrigan, 128 F.3d 330, 336-37 (6th Cir.1997), this court concluded that a remand was appropriate in order for the district court to consider and make a determination as to whether the defendant was entitled to the additional acceptance of responsibility point. Here, the district court did make such a determination on the facts before him, J.A. at 858-59 (Tr. Sentencing at 14-15) ("The Court has accepted the defendant's acceptance of responsibility in part, a two-level reduction ...."), and we hold that he did not err in deciding the way he did. See also Bashara, 27 F.3d at 1184-85. This case does indeed seem to be one of the extraordinary circumstances contemplated by Application Note 4 to U.S.S.G. § 3E1.1, where an acceptance of responsibility downward adjustment can co-exist with an obstruction of justice enhancement under U.S.S.G. § 3C1.1 (in Crenshaw's case, for recantation of his testimony).
 
 D
 
 26
 Defendant Sherman Giles first argues that his juvenile convictions should not have been counted toward his total criminal history score under the Sentencing Guidelines because Ohio law does not consider these violations to be "convictions" or "sentences." His argument is foreclosed by federal law in this circuit. "The classification of a juvenile placement is a factual question to which the 'clearly erroneous' standard of review applies." United States v. Hanley, 906 F.2d 1116, 1120 (6th Cir.), cert. denied, 498 U.S. 945, 111 S.Ct. 357, 112 L.Ed.2d 321 (1990). The district court did not commit clear error.
 
 
 27
 First, the language of the guidelines themselves clearly describes how to treat offenses committed before the age of eighteen in U.S.S.G. § 4A1.2(d). Giles was not convicted as an adult, so § 4A1.2(d)(1) does not apply, but § 4A1.2(d)(2) states that in any case other than conviction as an adult:
 
 
 28
 (A) add 2 points under § 4A1.1(b) for each adult or juvenile sentence to confinement of at least sixty days if the defendant was released from such confinement within five years of his commencement of the instant offense;
 
 
 29
 (B) add 1 point under § 4A1.1(c) for each adult or juvenile sentence imposed within five years of the defendant's commencement of the instant offense not covered in (A).
 
 
 30
 U.S.S.G. § 4A1.2(d)(2) (emphasis added). Regardless of how his juvenile offenses of assault and manslaughter are categorized under Ohio law, they are considered sentences under federal law, which governs interpretation of the Sentencing Guidelines. See United States v. Kirby, 893 F.2d 867, 868 (6th Cir.1990) ("Federal law, not [Ohio] law, controls sentencing disposition in the event of convictions for federal offenses."). Because one of them resulted in commitment of more than sixty days, the district court properly added two points for that one and one point for the other. Two panels of this circuit have held the same for juvenile offenses under Michigan and Kentucky law, respectively. See Hanley, 906 F.2d at 1120; Kirby, 893 F.2d at 868. Hanley held that juvenile commitments were properly determined to be "confinement" for purposes of § 4A1.2(d)(2)(A). See Hanley, 906 F.2d at 1120. In Kirby, the defendant "had been adjudicated delinquent by a Kentucky juvenile court on the basis of conduct that would constitute burglary, theft, and other related crimes...." Kirby, 893 F.2d at 868. There is no relevant distinction between Kentucky or Michigan law and Ohio law on this point. The district court did not err in adding three points to Giles's criminal history score.
 
 
 31
 Giles fares no better with his argument that these offenses are "juvenile status offenses" under § 4A1.2(c)(2). Black's Law Dictionary defines a "status crime" as "[a] class of crime which consists not in proscribed action or inaction, but in the accused's having a certain personal condition or being a person of a specified character. An example of a status crime is vagrancy." Indeed, the list of offenses which do not count toward a criminal history assessment under § 4A1.2(c)(2) are hitchhiking, juvenile status offenses and truancy, loitering, minor traffic infractions, public intoxication, and vagrancy. Manslaughter and assault are by no stretch similar in character to the offenses listed above.
 
 
 32
 Second, Giles argues that he received ineffective assistance of counsel because his lawyer withdrew most of the objections to the presentence report ("PSR")--specifically the one about the quantity of drugs for which Giles was responsible--at the sentencing hearing. Normally this court would not hear an ineffective assistance of counsel claim on direct appeal; "[i]f the parties have adequately developed the record, however, the court can elect to hear the issue on direct appeal." United States v. Pierce, 62 F.3d 818, 833 (6th Cir.1995), cert. denied, 516 U.S. 1136, 116 S.Ct. 965, 133 L.Ed.2d 886 (1996). Both sides have addressed the issue in their briefs, and Giles has new counsel on appeal, so we turn to the merits.
 
 
 33
 Essentially, Giles argues that his counsel should have maintained his objections to the quantity of cocaine for which he was held responsible--1.5 kilograms--and the withdrawal of that objection at sentencing means he cannot contest it directly on appeal or in habeas. The difficulty with this argument is that Giles stipulated to that amount in his plea agreement, J.A. at 372 (Giles's Plea Agreement at 4, p 8), and accepted this provision at his change of plea hearing, J.A. at 671-73 (Tr. Plea Hr'g at 20-22). Moreover, there were numerous witnesses prepared to testify to the drug activities of Giles, and the presentence report indicates that Giles admitted to approximately that quantity of drug activity. J.A. at 1054 (PSR at 18, p 92). In the face of this evidence, it is impossible to contend that the performance of Giles's attorney fell below the constitutionally required standard under the first prong of Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We need not reach the second prong of Strickland--whether the defendant was prejudiced by the error--because Giles needs to meet both prongs to make out an ineffective assistance of counsel claim. His claim founders on the first prong.
 
 
 34
 Finally, Giles contends that he was sentenced using an incorrect total offense level of 37, when it should have been 35, thereby subjecting him to a higher sentence than he deserves. The presentence report does indeed reflect a total offense level of 36, but a separate sentence was to be imposed on the § 924(c) gun charge. J.A. at 1057, 1055 (PSR at 21, p 108; 19, p 96). Subsequent to the PSR's initial preparation, the Supreme Court decided Bailey and the firearm count was dropped; however, like other defendants in this case, Giles was then properly assessed a two-level increase under U.S.S.G. § 2D1.1 for possession of a dangerous weapon. Thus, the correct total offense level was 38, as pointed out to the trial judge by counsel during the sentencing hearing. Originally the trial judge had denied a request for an additional "acceptance of responsibility" point and sentenced the defendant to 300 months. In light of the changed offense level and sentencing range (324-405 months), the court granted the additional point reducing the total offense level to 37 in order to keep the sentence at 300 months.
 
 
 35
 Giles's judgment does in fact reflect an improperly low sentencing range, although it reports the correct offense level and criminal history category. J.A. at 285 (J. Giles at 4). The sentencing range for offense level 37 and criminal history category IV is 292-365 months, the range within which Giles was sentenced. See U.S.S.G. Sentencing Table. Federal Rule of Criminal Procedure 36 would allow correction of this clerical error in stating the sentencing range by the district court "at any time." We recommend that the sentencing range be corrected, but we reiterate that Giles has not been prejudiced by the clerical error, and his sentence remains 300 months.
 
 E
 
 36
 Defendant Paul Crump alleges that there was not a sufficient factual basis for the district court to accept his plea, as required by Federal Rule of Criminal Procedure 11(f), which states that "the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." His argument seems to be that at the plea colloquy, the government agent mentioned briefly the entire conspiracy (lasting from July 1990 to March 1995) and that Crump was involved, but then specifically mentioned Crump's drug purchases only from the second half of 1994. Yet both money laundering charges predated these purchases, and the specifically mentioned drug activity could not have funded those purchases. See J.A. at 570-76 (Tr. Plea Hr'g at 29-35). Crump mentioned his confusion at the hearing, but after a conference with his lawyer, he stated that he understood to what he was pleading guilty.
 
 
 37
 It is true that the specific instances mentioned by the government agent right before Crump's acceptance of his plea do not hang together nicely, and standing alone, one might argue that they do not make out a sufficient factual basis for the plea. But earlier at the hearing, the district court read Count One in substantial part and explained what the government would have to prove to make out a conspiracy. He went over the elements of each crime, the potential penalties that would be imposed, and the many rights that Crump would forego if he pleaded guilty. And after Crump consulted with his attorney, the prosecutor stated that Crump was provided with two boxes of discovery detailing information concerning him. Crump was a fairly sophisticated defendant with two years of college behind him, and he was granted as much time as necessary to confer with counsel and clarify his understanding of the plea. He then stated twice that he understood his plea.
 
 
 38
 Although the lack of a sufficient factual basis for a plea can never be harmless error, see United States v. Tunning, 69 F.3d 107, 114-15 (6th Cir.1995), this court has noted that " '[w]here the crime is easily understood, several courts have held that a reading of the indictment, or even a summary of the charges in the indictment and an admission by the defendant, is sufficient to establish a factual basis under Rule 11.' " United States v. Edgecomb, 910 F.2d 1309, 1313 (6th Cir.1990) (quoting United States v. Van Buren, 804 F.2d 888, 892 (6th Cir.1986)). In Edgecomb, the court did little more than recite the count in the indictment and ask the defendants if they understood the charges against them, and the government read the facts constituting the conspiracy in that case. Such was held to be a sufficient factual basis under Rule 11. Id. In another Sixth Circuit case, the court noted that "Rule 11(f) does not provide any guidance concerning the steps a district court should take to ensure that a factual basis exists." United States v. Baez, 87 F.3d 805, 809 (6th Cir.), cert. denied, 519 U.S. 973, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996). There, "the court relied on the fact that the interpreter read the entire plea agreement to Baez before he signed it, and on Baez's one word affirmations that he had read and agreed with the paragraphs setting forth the factual basis for the plea." Id. Returning to Crump, then, and taking all the facts and circumstances of the plea hearing together, rather than focusing on the isolated few facts mentioned right before the acceptance of Crump's plea, we conclude that there was a sufficient factual basis for Crump's plea in this case. It was May 1994 before federal agents got involved in the investigation, which is why the specific instances cited by the federal agent on the stand were from that year. Evidence of Crump's substantial involvement in drug distribution during the years alleged in the indictment, however, was not lacking.
 
 
 39
 Crump also alleges, like Mays, that the 100:1 crack-powder sentencing disparity is unconstitutional. As discussed earlier, this circuit's case law clearly holds otherwise, and the argument is without merit.
 
 F
 
 40
 Defendant Wesley Moore argues that the trial court abused its discretion by refusing to allow him new counsel when requested. Moore was indicted in March and requested new counsel by letter on September 11, 1996, two weeks prior to trial. The district court held a hearing on the issue on September 18, 1996. A defendant is required to show good cause for a request to substitute counsel and to do so in a timely manner. A reviewing court takes several factors into account: timeliness of the motion; adequacy of the district court's inquiry into the matter; the extent of the conflict between the attorney and client and whether it resulted in a total lack of communication; and a balancing of these factors with "the public's interest in the prompt and efficient administration of justice." United States v. Jennings, 83 F.3d 145, 148 (6th Cir.) (quoting United States v. Iles, 906 F.2d 1122, 1130 n. 8 (6th Cir.1990)), cert. denied, 519 U.S. 975, 117 S.Ct. 411, 136 L.Ed.2d 324 (1996).
 
 
 41
 In Moore's case, his motion was not considered timely, the district court conducted a thorough inquiry, and the district court was not satisfied that communication had truly broken down, only that there was some lack of understanding or lack of confidence between Moore and his lawyer. Moreover, the "prompt and efficient administration of justice" weighed strongly in favor of continuing Moore's current representation (or allowing him to represent himself, with counsel nearby) due to the proximity of the scheduled start of the conspiracy trial. In short, after evaluating the attorney's background, experience, and work on the case to date, and giving due regard to Moore's concerns, the district court found that Moore had not made a showing sufficient to acquire new counsel. The decision was not an abuse of discretion.
 
 
 42
 Second, Moore argues that the court should have granted his motion to vacate his plea, but there is nothing in the record that indicates he made such a motion (nor does Moore cite to the record on this issue). In fact, at Moore's sentencing hearing, when asked by the judge if he wanted to speak on his own behalf, Moore did no more than apologize for his behavior right before sentence was imposed. There was no indication that he wished to revoke his guilty plea. This issue was not addressed to the district court in the first instance, and there is nothing for this court to review.
 
 
 43
 Moore's last argument parallels defendant Williams's first--that his base offense level should not have been enhanced two levels pursuant to U.S.S.G. § 2D1.1(b)(1) because a gun retrieved at the place where he was arrested was not sufficiently tied to him to warrant the enhancement. Moore, too, had an 18 U.S.C. § 924(c) count dropped in light of Bailey, but, as explained with respect to Williams, Bailey does not resolve the issue for him. The discussion of "constructive possession" and reasonable foreseeability of a co-conspirator's possession of a firearm applies with equal force to Moore as to Williams.
 
 
 44
 Moore, like Williams, pleaded guilty to "use of a firearm during a drug trafficking crime." J.A. at 364 (Moore Plea Agreement at 1, p 1). The count was later dropped, but the admission in the guilty plea meets the government's preponderance of the evidence standard for applying the gun enhancement to Moore's sentence. Like Williams, Moore was present in a residence where a loaded gun and drugs were found, and the guns were readily accessible to those in the house. Two days earlier, Moore sold drugs to an undercover officer at that address. He did not dispute this elucidation of the facts at his sentencing hearing.
 
 
 45
 There is a dispute in the briefs about whether Moore actually lived in the residence at the time of his arrest, but he had lived there during much of the course of the conspiracy to which he pleaded guilty, and objective evidence supports the position that "the defendant knew the weapon was present, or at least knew it was reasonably probable that his coconspirator would be armed." Cochran, 14 F.3d at 1133. In any case, it was not clear error for the district court to find that the government had met its burden of constructive possession during the course of the conspiracy by a preponderance of the evidence.
 
 III
 
 46
 We therefore AFFIRM the decisions of the district court as to the plea agreements and sentences of these six defendants.
 
 
 
 *
 This decision was originally issued as an "unpublished decision" filed on February 23, 1999. On March 22, 1999, the court designated the opinion as one recommended for full-text publication
 
 
 **
 The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation